Daniel J. PODBERESKY, Plaintiff,

v.

William E. KIRWAN, President of the
University of Maryland at College
Park, et al., Defendants,

and

Monica Greene, et al., Defendant–
Intervenors.

Civ. No. JFM–90–1685.

United States District Court,
D. Maryland.

Nov. 18, 1993.

Amended Order Nov. 22, 1993,
Nunc Pro Tunc.

Samuel Podberesky, Randallstown, MD, Richard A. Samp, Washington Legal Foundation, Washington, DC, for plaintiff.

Evelyn O. Cannon, Andrew Baida, Richard A. Weitzner, Office of the Atty. Gen., Baltimore, MD, for defendants.

Elaine R. Jones, Director–Counsel, Norman J. Chachkin, NAACP Legal Defense & Educational Fund, Inc., New York City, Janell M. Byrd, Randy E. Hayman, NAACP Legal Defense Fund, Washington, DC, William J. Murphy, John J. Connolly, Murphy & Shaffer, Baltimore, MD, Sally P. Paxton, Jacqueline R. Depew, Fulbright & Jaworski, Washington, DC, for defendants-intervenors.

## OPINION

MOTZ, District Judge.

The question posed in this case is whether a public university, racially segregated by law for almost a century and actively resistant to integration for at least twenty years thereafter, may—after confronting the injustice of its past—voluntarily seek to remedy the resulting problems of its present, by spending one percent of its financial aid budget to provide scholarships to approximately thirty high-achieving African–American students each year.

The case is now before me on remand from the United States Court of Appeals for the Fourth Circuit. I previously upheld the Benjamin Banneker Scholarship Program, a scholarship program at the University of Maryland at College Park [1] open only to African Americans. *Podberesky v. Kirwan,* 764 F.Supp. 364 (D.Md.1991) (*Podberesky I* ). In reversing my decision, the Fourth Circuit ruled that I had failed to make specific findings of present effects of past discrimination. It thus remanded the case for a determination on that issue. *Podberesky v. Kirwan,* 956 F.2d 52 (4th Cir.1992) (*Podberesky II* ). After the remand, UMCP engaged in an administrative fact-finding process to decide whether to continue the Banneker Program.

---

**1.** I will refer to the University of Maryland at College Park throughout this opinion as "UMCP" "the University" or "College Park".

In April 1993, the University issued a *Decision and Report* in which it concluded that the Program should be continued. Thereafter, the parties engaged in additional discovery and, at the conclusion of the discovery, filed cross-motions for summary judgment. Those motions were argued on October 22, 1993 and are now ripe for decision.[2]

### I.

Banneker scholarships currently provide full financial support for four years of study at UMCP. The most recent data available in the record as to the value of a Banneker scholarship is for the 1990–91 academic year. That year the scholarships awarded to in-state students were valued at $7,571 per year and the scholarships awarded to out-of-state students were valued at $11,627 per year. The aggregate annual cost of the Banneker Program during the 1990–91 school year was $594,351. It accounted for approximately one percent of UMCP's total financial aid budget. Def. Ex. 6 at 9.

The scholarships are awarded each year to black high school seniors on the basis of merit. In the fall of 1990, the minimum eligibility requirements were a 900 S.A.T. score and a 3.0 grade point average. Plaintiff met these requirements, having scored 1340 on the S.A.T. exam and having maintained an unweighted grade point average of 3.56. He applied for a Banneker scholarship but was not considered because he is not African–American. Twenty-eight Banneker scholarships were ultimately awarded to students entering UMCP in the fall of 1990. A total of 3145 freshmen were admitted that year.

### II.

The history of African–American higher education in Maryland before *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) is typical of most southern states. Maryland's policy towards the education of its black citizens was characterized by the reluctant establishment of institutions of higher education for blacks that were segregated, vastly underfunded and consistently neglected.[3] As a result, when the State Commission on the Higher Education of Negroes investigated the conditions in the state's black colleges in 1937, it documented dramatic funding disparities and drastically inferior facilities and curricula in every major field, including teacher education, agricultural and vocational education, liberal arts, fine arts, graduate and professional training, and extension opportunities. In light of this evidence the Commission concluded that the state "had failed to make adequate provision for Negroes."[4]

By the late 1930s, the state was under pressure, mainly from the National Association For the Advancement of Colored People, to equalize the quality of its educational institutions in order to comply with the constitutional requirements articulated by the Supreme Court in *Plessy v. Ferguson.*[5] In 1945, the Maryland Commission on Higher Education recommended that African–Americans be admitted to the state's all-white graduate schools and that funding for all-black colleges be increased to parity with that of the white schools. Harry "Curley" Byrd, President of the University of Maryland from 1935 until 1953, agreed that funding should be equalized[6] but was vehemently opposed to integrating the University's graduate and professional schools: "Admission [of African–Americans] to the Graduate School

---

2. William E. Kirwan and the University of Maryland at College Park are both named as defendants. I have referred to them collectively as "UMCP" throughout this Opinion. Several Banneker scholars and their parents have intervened as defendants and are referred to in their capacity as such. The United States has also filed an amicus brief in support of the Banneker Program.

3. Def.Ex. 70 at 137–54. Even federal land grant funds, which were specifically designated for Maryland's black colleges, were diverted to white schools. *Id.* at 141 n. 366.

4. *Id.* at 146.

5. 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896). For information about the NAACP's campaign to desegregate Maryland's primary, secondary and post-secondary schools, see Tushnet, *The NAACP's Legal Strategy Against Segregated Education, 1925–1950* at 54–68 (1987).

6. "If we don't do something about Princess Anne," Byrd said in 1937, referring to what at the time was the only state funded black college in Maryland, "we're going to have to accept Negroes at College Park, where our girls are." Def.Ex. 70 at 147.

would mean admission to College Park, and would destroy the very segregation [sic] idea for the undergraduate school."[7] In 1949, Byrd recommended privatizing UMCP rather than allowing black graduate students to enroll there.[8] However, against the background of the two Supreme Court decisions requiring the admission of black students to segregated graduate schools in Oklahoma and Texas,[9] Byrd's suggestion was rejected and UMCP admitted its first black graduate student in 1951.[10] Any further debate over the propriety of integrating the University of Maryland system was mooted by *Brown v. Board of Education.*

Maryland's reaction to *Brown* was restrained but unenthusiastic. Unlike other states where schools had been segregated by law, there was no policy of massive resistance and, in June of 1954, the University's Board of Regents agreed to admit "all residents of Maryland without regard to race."[11] However, the state did little to promote integration. The Board of Regents, like the governing bodies of many other segregated state schools, pledged to admit black students, but imposed new admissions standards and required standardized testing of all applicants. Such requirements served to exclude African–Americans who might have otherwise been admitted during the first years after *Brown.*[12] Similarly, in 1960, when the Governor proposed a complex plan to accommodate the growth of UMCP by converting several regional state colleges into additional branches of the flagship campus, no all-black colleges were considered for conversion, thus preserving the segregated character of College Park.[13] Most importantly, UMCP simply made no effort to recruit African–American students. As the Board of Trustees of the Maryland State Colleges reported in 1969, "it is only recently that formerly white colleges [have] made more than perfunctory efforts at other race recruitment."[14] The result of this neglect was not surprising: "For a vast majority of parents and students the question of race simply does not arise. Rather, it is generally taken for granted by both black and white students and parents that the choice [of which college a student attends] takes place within the framework of colleges of one's own race."[15]

Not only did UMCP's administration fail to take steps to integrate its campus in the decade and a half after *Brown,* it also failed to offer a particularly sympathetic ear to the concerns of the few African–American students who attended the University in the late fifties and early sixties. In 1963, a faculty committee refused to allow students to form an on-campus chapter of the Congress for Racial Equality. The following year the University discouraged Martin Luther King, Jr. from speaking on campus, and, that same year, the Dean of Student Life forbade campus chaplains from participating in civil rights activities.[16]

The environment in which black students found themselves during the early 1960s was notably inhospitable. The University, despite its worries about the effect that Dr. King's presence on campus might have, permitted George Wallace to speak at the school in 1964. According to University historian George Callcott, Wallace attracted the largest crowd in the history of the University. "The emotional intensity" of the eight thousand students, Callcott wrote, "exceeded that of a football game."[17] Off-campus housing was completely segregated and when an inte-

7. *Id.* at 152.

8. *Id.*

9. *Sweatt v. Painter,* 339 U.S. 629, 70 S.Ct. 848, 94 L.Ed. 1114 (1950), and *McLaurin v. Oklahoma State Regents for Higher Education,* 339 U.S. 637, 70 S.Ct. 851, 94 L.Ed. 1149 (1950).

10. Def.Ex. 70 at 154.

11. Def.Ex. 70 at 158.

12. *Id.* at 158.

13. *Report of the Governor's Commission to Study the Problem of the Expansion of the University of Maryland* (1960).

14. *A Study of Racial Integration in the Maryland State College System* at 13 (1969).

15. *Id.* at 5.

16. Def.Ex. 70 at 160.

17. Callcott, *A History of the University of Maryland* at 394–95 (1966).

grated dormitory was established for a summer "citizenship" program in 1966, the Ku Klux Klan marched in protest.[18] Considering UMCP's institutional indifference to integration and the hostility of the campus climate, it is not surprising that black student enrollment stayed below 1% of the undergraduate population from 1954 until the end of the 1960s.[19]

In 1968, the United States Department of Health, Education and Welfare's Office of Civil Rights (OCR) began pressuring the state of Maryland to integrate its institutions of higher learning.[20] The University responded by establishing the Committee on Meaningful Integration.[21] The initial recruitment plan proposed by the University offered enhanced academic programs at UMCP in order to attract African–American students from the state's predominantly black colleges.

Events between 1970, when the plan was proposed, and 1973, when OCR rejected the plan as "ineffectual", demonstrated that the University was not committed to the "meaningful" integration that the name of the Committee promised.[22] The University did not increase its financial aid expenditures to meet the needs of black students most of whom came from low or moderate income families.[23] Increased efforts to integrate UMCP's dormitories, though ultimately successful, were met with resistance from the University's Director of Housing, particularly over the issue of recruiting minority students to be resident assistants.[24] The University failed to provide financial support for the building of black fraternity and sorority houses even though it had spent a million dollars to build ten white fraternities and sororities on campus during the late fifties and early sixties.[25] Similarly, the facilities used to house black students programs, such as the black cultural center and the Intensive Educational Development Program, were substandard with inadequate heating and broken toilets.[26] In 1972, Vice Chancellor Bratton, who had administrative control over the Office of Minority Student Education (OMSE), spoke of the difficulty of getting funding for programs aimed at recruiting and retaining African–Americans:

> Several of my colleagues, both within Student Affairs and the campus central administration, showed either naivete or resistance to the creation of a viable minority student affairs operation. Even now, including salaries, this office [OMSE] has only a $42,000 budget and this was literally drawn from the foot-kicking hides of everyone. My own staff deeply resented the transference of lines to create this operation [27] and my experience with the budget committee when I went to them for all of $7000 for this effort still leaves me despondent. $42,000 is only .004% of the student affairs budget and .0005% of the campus budget and the reaction was unworthy of professional educators.[28]

As if UMCP's financial neglect of the needs of African–American undergraduates was not enough of an obstacle to black recruiting, the University's disinterest in attracting black students spilled over into the Admissions Office. The administration refused to establish a separate office of minority recruitment and provided only partial funding for the recently created Equal Op-

---

**18.** Def.Ex. 101, ¶ 4.

**19.** Def.Ex. 70 at 161.

**20.** Def.Ex. 71.

**21.** The name of the Committee seems to be a rather candid admission of the University's past failings.

**22.** Def.Ex. 79.

**23.** Def.Ex. 70 at 178.

**24.** The Director of Housing believed that setting aside dorm rooms for black students violated Title IV, and she admitted to changing the academic standing requirements for employment as a resident assistant when African–American students applied. Def.Ex. 70 at 184–85.

**25.** *Id.* at 168.

**26.** *Id.* at 220–21.

**27.** Rather than establishing OMSE from whole cloth, UMCP created it by transferring personnel away from other programs aimed at recruiting African–Americans. *Id.* at 194–99.

**28.** *Id.* at 193.

portunity Recruitment Program within the Admissions Office. Moreover, the Admissions Office itself was not particularly sympathetic to the cause of recruiting black students. As one black administrator wrote to the Chancellor of the University in 1972:

> The admissions counselors who have addressed themselves to minority recruitment find themselves working in an environment which is increasingly repressive and hostile. The hostility has reached such a level that the counselors without exception request their operation be placed in a different division of the University.[29]

Indeed, this hostility towards minority recruitment existed at the highest levels of the University administration. When the Chancellor's Committee on Minority Education pressured UMCP to step up minority recruitment and retention efforts and to increase the amount of financial aid available to minority students, the administration dismissed the Committee's report as "abusive, fuzzy, non-realistic and non-constructive" with recommendations that "sound like a parody." [30]

In 1973, OCR rejected the 1970 Plan, concluding that, after three years, it was not successfully desegregating UMCP. OCR pointed out that the colleges in the Maryland State University system still retained duplicative programs and that the areas of specialization at historically black colleges reflected stereotypical notions of what were considered appropriate careers for African–Americans.[31] The entire Maryland system of higher education could not be expected to desegregate, OCR wrote, while the traditionally black colleges offered specialization in areas that were notably less attractive than the programs at the state's white universities.[32] In some instances, the state seemed to be hindering the interaction of students of different races. The state, for example, set up a cooperative engineering program wherein students at the traditionally black Morgan State would take two years of courses towards an engineering degree at New York University despite the fact that the same program could have been arranged using UMCP's college of engineering.[33]

After the rejection of the 1970 Plan, the state produced a new plan, proposing to increase efforts at minority recruitment, eliminate duplicative academic programs within the state, and set specific minority recruitment goals for UMCP.[34] This revised plan was accepted in 1974, but a year later OCR threatened to start proceedings to terminate the state's federal education funding because "Maryland has repeatedly failed to act in a manner which would indicate that it is executing the Plan promptly and vigorously." [35] The state successfully enjoined these proceedings until OCR promulgated guidelines setting forth specific standards for Title VI

**29.** *Id.* at 187, quoting Jan. 5, 1972 letter, Meldon Hollis to Chancellor Bishop.

**30.** Def.Ex. 70 at 204. Ironically, some of the Committee's "abusive, fuzzy, non-realistic and non-constructive" recommendations, such as specific numerical goals for African–American enrollment, were adopted a year later in the University's 1973 Desegregation Plan. *Id.* at 207.

**31.** For example, under the 1970 Plan, while UMCP retained its status as the only state funded institution in Maryland offering doctoral and professional programs, and the historically white Towson State received programs that provided "an excellent background for many careers such as law, public relations, business, communications media, sales and management", the state's traditionally black colleges were given undergraduate programs designed to train their students to work within a population of criminals and persons with mental and physical deficien-

cies. Bowie State College offered a social work program "with special emphasis on socially and emotionally disturbed, delinquent, mentally retarded, physically ill or handicapped children or adults." Coppin State offered an "Industrial Arts Program" as well as "Correctional Education Program to focus on the large percentage of illiterates sentenced to correctional facilities." Morgan State offered a "Community Mental Health Program with an opportunity for lower-echelon workers at State institutions to upgrade their training with a focus particularly on preparation for work in an inner city context." Def–Int.Ex. 7 at 5–6.

**32.** Def.Ex. 79.

**33.** *Id.*

**34.** Def.Ex. 70 at 208–209.

**35.** Def–Int.Ex. 12.

compliance.[36]

Even as the 1973 Plan was being implemented and as OCR developed criteria for Title VI compliance, the University took actions that hindered its own efforts at desegregation. The Office of Minority Student Education was downgraded and its various components were transferred to other administrative units of the University.[37] In 1978 the University's Board of Regents approved a "Master Plan" for the University of Maryland system. Under this plan UMCP was to deemphasize the remedial aspects of its curriculum, reduce the size of the incoming freshmen class by emphasizing "quality over quantity", and concentrate its resources on upper level education. Despite the 1973 Desegregation Plan's goals for increased minority admissions, the Master Plan assumed that minority enrollment would remain stable. Nor did the Master Plan make any provisions for recruiting minority students or consider the adverse impact on African–American enrollment that UMCP's new admissions requirements would have.[38] Not surprisingly, in 1978, after developing criteria for Title VI compliance, OCR once again concluded that Maryland was not taking sufficient action to desegregate its institutions of higher learning.[39]

In 1980 the State voluntarily submitted a fourth compliance plan to OCR. In its 1980 Plan, UMCP revised its goals *downward* for the 1980 to 1985 time period. The State began setting its numeric goals for "other races" in terms of percentages of "first-time, full-time freshmen" rather than as percentages of the total pool of undergraduates. Thus, when UMCP set a range of 10% to 12% as its 1985 goal for other-race *freshmen*, that number was substantially lower than the 1974 Plan's 13–16% figure for *all* undergraduates by 1980. The decision to focus on

"first-time, full-time freshmen" was a curious one, given that the state recognized retention problems as possibly "the single most important equal educational opportunity issue facing the public higher education institutions in the State." OCR staff concluded that Maryland's submission did not amount to an honest attempt to meet Title VI:

> [T]he State has adopted enrollment goals which would cause some schools to be more racially identifiable in 1985 than they are now; has not moved to establish formal institutional missions which would distinguish one school from another on any basis other than the race of the students for whom the various schools originally were established; and has provided no specific steps which it will take to improve, enhance and enrich its TBIs [Traditionally Black Institutions] and therefore to assure equal educational opportunities for the students who attend those schools.[40]

OCR and the State continued negotiating and in 1985 the State submitted yet a fifth plan (the "1985–89 Plan"). The new Plan included specific reliance on the Benjamin Banneker Scholarship Program as one of UMCP's most important recruitment efforts:

> The Benjamin Banneker Scholarship Program has been a valuable asset in the Campus's efforts to recruit academically talented Black students. This program[,] which began in 1978, originally provided two-year scholarships with stipends of $1,000 per year. This scholarship has been expanded for a duration of four years for each recipient. For 1985–1989, these scholarships will be continued with approximately 20 new winners named each year.

On June 3, 1985 OCR accepted the 1985–89 Plan as "compliance with Title VI for the life of the plan." [41]

**36.** *Mandel v. HEW*, 411 F.Supp. 542 (D.Md. 1976).

**37.** Def.Ex. 70 at 211–14.

**38.** *Id.* at 239–40.

**39.** Def–Int.Ex. 14.

**40.** Def–Int.Ex. 16 at 12.

**41.** In 1978, when the University first implemented the Banneker Program, it consisted of two year scholarships with stipends of $1000 per year. These scholarships were available to all "minority students." Def–Int.Ex. 20. The University found that, funded at this level, the scholarship was not accomplishing its goal of attracting high-achieving African–American students to UMCP. Accordingly, in 1988, UMCP increased the value of the scholarship and limited it to African–Americans. Pl.Ex. 25.

The 1985–89 Plan expired in June 1990. Maryland officials have issued their report on the 1985 Plan and are waiting for an OCR inspection to determine whether the State is finally in compliance with Title VI. Until this OCR inspection is completed [42]—and until OCR notifies the State that it is finally in compliance with Title VI—the State has stated its intention to continue to abide by the 1985–89 Plan.

Between 1954 and 1978, when the Banneker Program was instituted, the number of African–American undergraduates at UMCP grew from none to nearly 2000, making up 7.2% of the undergraduate population by 1978.[43] In many ways, this growth took place despite the actions of the University. Whether manifested by the overtly racist comments of "Curley" Byrd, the absolute neglect of black recruiting during the sixties, the underfunding of African–American facilities, the institutional hostility towards the administrative units at UMCP responsible for desegregation, or the constant squabbling with the OCR, the University demonstrated at worst contempt for and at best grudging acceptance of its constitutional obligation to desegregate. It was only in the late 1970s, with the advent of the Banneker Program, that UMCP finally began to take meaningful steps towards integrating its campus. Indeed, it is only since the late 1980s that the University has made any genuine progress towards eliminating its single race status.[44]

### III.

Since William Kirwan became president of UMCP fifteen years ago, the University has earnestly taken steps to remedy its history of segregation. Its efforts have born fruit. African–American matriculation rates have slowly edged up so that blacks made up approximately 15% of the freshman class entering UMCP in the fall of 1993.[45] Additionally, in 1990, UMCP ranked fourth among predominantly white universities in terms of the number of African–American students receiving degrees.[46]

Despite these accomplishments, UMCP's April 1993 *Decision and Report* (the "D & R") concluded that the Banneker Program should be continued. The D & R first identified four effects of the University's past discrimination which persist into the present: (1) a poor reputation of the university in the African–American community, particularly among parents and high school counselors who influence students' college choices; (2) underrepresentation of African–Americans in the student population; (3) low retention and graduation rates of African–Americans; and (4) perceptions of a campus climate that is hostile to African–Americans. The D & R next found that the Banneker Program has been successful in helping to overcome these vestiges of discrimination and that alternative remedies, specifically race-neutral merit scholarships or expanded need-based financial aid, would not be similarly efficacious. Finally, the D & R required that the Banneker Program be reviewed and evaluated at least once every three years to determine whether its goals have been achieved and whether it should be continued.[47]

---

**42.** There is no evidence in the record indicating whether OCR has completed its evaluation of the 1985 Plan. However, the United States' amicus brief argues that Maryland still operates a dual system of higher education even if it has made progress towards eliminating the vestiges of its past discrimination.

**43.** Def.Mem. at 11.

**44.** It took the University from 1975 to 1983 to increase its black enrollment from 6.8% to 8.1%. Later in the decade, the same 1.3% increase took only two years—between *1988* and *1990* the percentage of black undergraduates increased from 9.9 percent to 11.2%. Def.Mem. at 11.

**45.** UMCP Office of Institutional Studies, Student Enrollment Rates, October 5, 1993. In fact, the percentage of black in-state first-time, full-time freshmen has fluctuated over the last six years. The percentages are as follows: 1992 (10.38%), 1991 (13.7%), 1990 (14.2%), 1989 (15.2%), 1988 (13.3%). Def–Int.Ex. 37.

**46.** It is worth noting, however, that UMCP's African–American graduation rate, when measured as a percentage of the entire graduating class, ranked 29th among traditionally white colleges. In 1990, 6.3% of UMCP's graduates were black. Pl.Ex. 62.

**47.** It is worthy of note that the University is (to put it mildly) in a somewhat unusual situation. It is not often that a litigant is required to engage in extended self-criticism in order to justify its pursuit of a goal that it deems worthy. All other

## IV.

 The Fourth Circuit affirmed my prior ruling that the Banneker Program must be subjected to a strict scrutiny test under the equal protection clause of the Fourteenth Amendment. ·Accordingly, the Program must serve "a compelling governmental interest" and must be "narrowly tailored to the achievement of that goal." *Podberesky II*, 956 F.2d at 55. The Fourth Circuit explained that in order to meet the "compelling governmental interest" element of the test, defendants must show that there is a "strong evidentiary basis for concluding that remedial action is necessary." The

Court did not define precisely what a "strong evidentiary basis" is but plaintiff concedes that the standard is somewhat less than a preponderance of the evidence. The present effects of past discrimination need not be widespread or pervasive. There must only be "strong" evidence of *"some"* present effects. *Id.* at 57. Thus, if there is a strong evidentiary basis for any one of the four present effects of past discrimination which UMCP found to exist, that would be sufficient to sustain the. Banneker Program.[48] For the reasons which follow, I am of the view that all four of UMCP's· findings are supported by strong evidence.[49]

matters aside, UMCP administrators are to be commended for the moral courage that they have demonstrated in undertaking this self-examination with an admirable degree of candor.

**48.** To pass constitutional muster, affirmative action programs must also be narrowly tailored. *Podberesky II*, 956 F.2d at 55. *See infra* section V.

**49.** The parties furiously debate the meaning of the phrase "strong evidentiary basis." In the final analysis, after the smoke has cleared, it appears that plaintiff contends that the standard is "somewhat less than a preponderance of the evidence" while defendants say it is the functional equivalent of the "substantial evidence" test. The Fourth Circuit has described the latter as either "less than a preponderance but more than a scintilla" or as enough evidence "as a reasonable mind might accept as adequate to support a conclusion and ... sufficient to justify a refusal to direct a verdict were the case before a jury." *Laws v. Celebrezze*, 368 F.2d 640 (4th Cir.1966); *Teague v. Califano*, 560 F.2d 615 (4th Cir.1977).

Ultimately, what is significant is that both sides agree that defendants' burden is to produce something less than the preponderance of the evidence. This standard is compatible with the Supreme Court's desire to "smoke out" and prohibit "racial politics" without preventing local governments from voluntarily eliminating the vestiges of past discrimination. *City of Richmond v. Croson*, 488 U.S. 469, 493, 109 S.Ct. 706, 721, 102 L.Ed.2d 854 (1989); *Wygant v. Jackson Board of Education*, 476 U.S. 267, 290–92, 106 S.Ct. 1842, 1855–56, 90 L.Ed.2d 260 (1986) (O'Connor, J., concurring). Further, this standard of evidence comports with language in · *Croson* that states that the standard should not be so strict as to render every affirmative action program unconstitutional. *Croson*, 488 U.S. at ·519, 109 S.Ct. at 735 (Kennedy, J., concurring in part and concurring in judgment) ("[A] rule of automatic invalidity for racial preferences in almost every case would be a significant break with our precedents...."). Thus, placing an evi-

dentiary burden upon the defendant that is "somewhat less" then a preponderance of the evidence, reconciles the Supreme Court's desire to subject the rationale of affirmative action programs to strict scrutiny without chilling the states' ability to voluntarily eliminate the results of its past discriminatory actions. See *Id.* at 518, 109 S.Ct. at 734 (Kennedy, J., concurring in part and concurring in judgment) ("[T]he State has the power to eradicate racial discrimination and its effects in both the public and private sectors, and the absolute duty to do so where those wrongs were caused intentionally by the State itself.").

I hold below that UMCP has a strong basis in evidence for finding that there exist four present effects of past discrimination: 1) UMCP's bad reputation in the African–American community, 2) underrepresentation of African–Americans in UMCP's student body, 3) African–Americans' disproportionally low retention and graduation rates, and 4) the existence of a hostile racial climate at UMCP. To the extent that reasonable minds may differ over whether these conditions exist or whether they are linked to UMCP's past discrimination, it is important to remember what UMCP's burden of production is. They need not prove these present effects of past discrimination beyond a reasonable doubt, by clear and convincing evidence, or even by a preponderance of the evidence. The standard they must meet is *less* than a preponderance of the evidence. To require any greater a standard would be in explicit contradiction of the Court's requirement in *Croson* that the burden of persuasion remain with · the plaintiff in reverse discrimination cases. 488 U.S. at 500, 109 S.Ct. at 725.

I should further note that the language which I later employ in upholding UMCP's findings could be interpreted as suggesting that defendants bear · the ultimate burden of proof. In fact, if that were so, I would still find that defendants are entitled to· summary judgment. However, in a reverse discrimination case such as this the burden of persuasion always remains with the plaintiff. *Croson*, 488 U.S. at 500, 109 S.Ct. at 725. Thus, while plaintiff has challenged the evidence

## A.

■ The first present effect of past discrimination found by UMCP in its *Decision and Report* is the University's continuing poor reputation in the African–American community, particularly among parents, high school counselors and prospective students.

### 1. *The Evidence Relied Upon By UMCP*

As part of the process leading to the issuance of its *Decision and Report*, UMCP commissioned an evaluation of the Banneker Program by Walter R. Allen, a sociology professor at the University of California— Los Angeles.[50] Allen, in preparing his study, interviewed high school guidance counselors and conducted four student focus groups. One counselor told Allen that in the past the University "wasn't a friendly place for Blacks to be. They didn't want you to be there." Another said: "I don't feel good about College Park ... yet." The students confirmed that these impressions were conveyed to them by their elders. According to Allen, "the single most vivid image they had of College Park prior to attending the campus was that it was 'an all-white university.' This common perception they said, *was* the university's 'reputation.'" *Id.* at 34. Thus, Allen concluded that UMCP "is in large degree burdened by its history when it comes to recruiting Black students." *Id.* at 30.

Joe R. Feagin, a race relations consultant, prepared two reports for UMCP, one focusing on the views of African–American parents and the other on the views of African– American students.[51] The first report was based upon a series of focus groups consisting of black parents of college age children. Eighty-three percent of the participants in these groups indicated on an exit questionnaire that the reputation of UMCP is "mostly negative" or "somewhat negative." Feagin Report I, at 7. Seventy-six percent of the parents "tended to agree" or "strongly agreed" that "in the past, historically, the University of Maryland at College Park has done a poor job of serving the black community and black students." Individual comments made during the course of the focus group proceedings confirmed these views. For example, in one of the focus groups of African–American parents, the following exchange occurred:

> Black parent (male): I'm old enough, I'm old enough to remember when practically every teacher in ... Maryland graduated from Morgan. You know so it wasn't a lot of options at one time, you know.
>
> Black parent (male): Looking back I was raised here, and I've been in Montgomery County most of my life, and I can remember people applying to University of Maryland, and they would be referred to, because of their race, you know, wouldn't you be more comfortable at Maryland State, which was the university of Eastern Shore, or Morgan, or Bowie. They would invariably try to refer you to a black school.
>
> Black parent (female): It is, that's true. It's true it is. They would do that. If you go to them they would refer or they would recommend or suggest that you go to another college.

relied upon by UMCP, he has not produced any persuasive affirmative evidence in support of his position. This absence of evidence makes defendants' entitlement to summary judgment even more clear. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) ("[T]he plain language of Rule 56(c) mandates entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the essential element to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is 'en-

titled to a judgment as a matter of law' because the nonmoving part has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.") (quoting Fed.R.Civ.P. 56(c)).

**50.** "The Benjamin Banneker Scholars Program For High-Achieving African–American Students At The University Of Maryland—College Park: An Evaluation Study ("The Allen Report")." Def.Ex. 6.

**51.** "Black Students At The University Of Maryland (College Park): The Views Of Black Parents In Maryland" (Feagin Report I), Def.Ex. 7. Feagin, "Black In A White World: Black Students At The University Of Maryland College Park)" (Feagin Report II), Def.Ex. 13.

Feagin Report I, at 13–14. Similarly, the remarks of one of the participants in a student focus group illustrate the importance that the perceptions of parents play in forming their children's views of UMCP.

> I·had so many like people my parents age and people older than that going, "Oh girl don't go there" you know people just telling me that it was the worst place for me to go. "Go to UMBC. Go to _____." Well Eastern Shore was the one they kept telling me to go to since it's predominantly black.... [Focus group leader: Do you know what made them say that?] Well, College Park didn't have it's first student, I think it was a graduate student, till like the mid-sixties. The first black student, I mean, and the environment just wasn't conducive I guess to black students. So it's just the kind of thing.that we knew we weren't wanted here. I guess that's what they meant.

Feagin Report II, at 9–10.

The experience of UMCP officials involved in recruiting black students provides equally solid evidence of University's poor reputation among African–Americans. James Newton, the Acting Assistant to the Vice–President of Academic Affairs at UMCP, has stated:

> I was born in 1947, and until 1975 I had never set foot on the College Park campus, even though I lived only 34 miles away. I was familiar with College Park's history as a segregated campus: I heard stories from my wife's sisters, who are black, about College Park as the institution that told them they were not welcome as graduate students there and as the institution that received funding from a State that sent my in-laws to go to graduate school in New York rather than allowing them to attend UMCP. I did not regard the College Park campus as a place that would·welcome me as a black student or a black teacher.... It was during my one year at UMCP that I learned first hand about the way teachers, administrators and students in Baltimore City perceived .UMCP. I spoke to those individuals in my capacity as a UMCP · recruiter. I was told by many teachers, principals and counselors that they were not welcome in the 1950's to perform grad-uate work at the College Park campus. These individuals, of course, were the ones who were advising black students in 1976 (and in some cases still are rendering that advice today) on the colleges these students should attend. Almost invariably, the college would not be College Park. Those students would be encouraged instead to attend one of the State's historically black colleges because these high school principals and counselors did not feel that blacks would do well or be welcomed at UMCP. The principals and counselors with whom I spoke expressed the fear that blacks would not be treated fairly by faculty, who in many instances exhibited negative expectations toward black students. For these reasons, principals and counselors simply did not believe that the black students in their schools could be successful at UMCP. Even though I·tried to point out the opportunities available at College Park· for black students, the administrators I spoke to were not telling the students to· look at College Park because they believed it was not a good place to go based on their own, negative experiences, and based on similar experiences of ·their former students, whose feedback over the years indicated that life at UMCP for blacks had not significantly changed over time.

Def. Ex. 10, ¶¶ 6 and 8.

To similar effect is.the affidavit testimony of Mary E. Cothran, Director of the Office of Multi–Ethnic Student Education at UMCP.

> In 1980, when I began working in undergraduate admissions, one of the top priorities at UMCP was to increase the presence of blacks in the student body and enhance their experiences. This was no small task, particularly because the community perceptions at that time were that UMCP was not open to or supportive of black students. The African–American community, including but not limited to Montgomery County civic groups and public school groups, did not believe that black students would do well at UMCP. Many of the high school counselors and community leaders with whom I spoke encouraged black high school students to attend other

schools rather than the University of Maryland because of this school's history of segregation. As stated earlier, it was mainly parents, counselors and students from outside Maryland who perceived UMCP as a positive educational environment. . . .

Def.Ex. 11, ¶ 7.

Linda Clement, the Director of Undergraduate Admissions at the University, concurs:

> The University's history of segregation continues to affect its ability to recruit Black students. Parents, counselors and others who influence the student's choice of undergraduate institutions recall that history. Such notoriety continues to impact reputation; reputation once developed is difficult to modify, especially in significant ways. The Banneker Program is a concrete rebuttal to charges that the University's commitment is superficial or rhetorical. Without it, not only will the University's desegregation efforts be severely hampered and some of the results be eliminated, but the University's diversity efforts will similarly be retarded. Of necessity, desegregation and diversity goals overlap in the function of this University.

Def.Ex. 9, ¶ 33.

### 2. Plaintiff's Arguments

The arguments that plaintiff advances in an effort to overcome this evidence are insubstantial. First, he presents evidence of his own intended to show that UMCP does not have a bad reputation among African–Americans: two surveys of black high school students, one survey of African–American students at UMCP, response cards mailed in by students who have decided not to attend UMCP and the affidavit of John Roth, a counselor at the high school that plaintiff attended. The surveys, conducted by a high school junior, a sophomore architecture and government major at UMCP, and a freshman at Montgomery College, are methodologically flawed because they are not taken from truly random samples of students and because the surveyors made no effort to follow up on the responses. The information provided by the response cards is of little value in this context since it asks no questions designed to elicit relevant information. While Roth may sincerely hold the views that he expresses, it does not contradict the contrary views expressed by many other counselors and parents and the actual experience of UMCP officials responsible for recruitment. In any event, in determining the constitutionality of the Banneker scholarships, the question is not whether plaintiff can find some scatterings of information to support his position but whether there is a strong evidentiary basis for the conclusions reached by UMCP.

Second, plaintiff posits that a review of the transcripts of the various focus groups upon which the Allen and Feagin Reports are based discloses (1) that researchers asked questions designed to elicit negative responses about UMCP, and (2) that, nevertheless, positive statements about the University were made. It may be fair to say that in writing the body of their reports neither Allen nor Feagin (particularly the latter) appears to have been self-critical about his own biases and predispositions. It may also be in the nature of focus groups to generate self-perpetuating momentum. However, the transcripts do not reveal that unfair leading questions were asked as a means of obtaining slanted responses. Moreover, plaintiff has cited only one example of an allegedly positive remark about the University; it related to UMCP's reputation as a place for black athletes to go to "prepare for professional sports." Pl.Ex. 47 at 28.

Third, plaintiff baldly asserts that the evidence does not establish any causal link between past discrimination and the University's present poor reputation among African–Americans. Given the University's history of discrimination, this assertion defies belief. It is also specifically belied by statements made by participants in the focus groups and by the experience of UMCP officials responsible for recruitment of African–Americans.

Fourth, plaintiff contends that since African–Americans are not underrepresented at UMCP, any poor reputation that the University may have is of no practical effect. This contention erroneously assumes (as discussed *infra* section IV.B.) that African–Americans are not underrepresented at UMCP. More-

over, even if African–Americans were not statistically underrepresented at College Park, the existence of the University's poor reputation among African–Americans would nevertheless have an adverse effect by reducing the pool of black students from which it can draw. This would have the strong potential effect of decreasing the number of high-achieving African–American students at College Park, contributing to racial stereotyping that perpetuates an adverse racial climate which, in turn, hampers UMCP's efforts to retain African–American students.

Finally, plaintiff cites two cases, *Brunet v. City of Columbia*, 1 F.3d 390 (6th Cir.1993) and *Hammon v. Barry*, 813 F.2d 412 (D.C.Cir.1987), as standing for the proposition that racial discrimination that occurred many years in the past cannot, as a matter of law, be found to cause present effects. If that were the law, then the Fourth Circuit has asked me to engage in an academic exercise on remand. In any event, plaintiff misreads *Brunet* and *Hammon*. All that these cases held was that under the particular facts presented, the past discrimination was too remote to support a finding of present effects. Here, the evidence is overwhelming that a poor reputation of UMCP among African–Americans persists.[52]

### B.

The second present effect of past discrimination that UMCP has found to exist is the underrepresentation of African–Americans in its student body. The historical data behind the finding is succinct, startling and undisputed. "Prior to 1954, there were virtually no African–American students on campus. The end of *de jure* segregation produced no visible changes. As late as 1969, fifteen years after *Brown* was decided, fewer than 1% of the students at the University were African–American. In 1970, 3.4% of the University's full-time undergraduates were African–American; in 1975, 6.8%; in 1980, 7.5%; in 1985, 8.6%; in 1990, 11.2%." *Decision*

*and Report* at 15–16. The percentages of incoming freshmen at UMCP who have been African–American are comparable, ranging from 6.6% in 1974 (the first year in which that statistic was kept) to 10.5% in 1985. Because of the efforts that the University has been making, this figure increased to 15% in 1990. It dropped to 13% and 11.3% in 1991 and 1992, respectively, but again reached 15% in 1993. Def.Ex. 72.

### 1. Selection of a Reference Pool

■ The question of underrepresentation requires, of course, the selection of a reference pool of eligible candidates against which the level of representation can be measured. *Croson*, 488 U.S. at 501–02, 109 S.Ct. at 726. *Maryland Troopers Association, Inc. v. Evans*, 993 F.2d 1072 (4th Cir.1993). Plaintiff alleges that the reference pool should be composed of graduating high school seniors who meet all of what he alleges to be the minimum requirements for admission to UMCP: completion of the required high school course curriculum, maintenance of a 2.0 grade point average and attaining a verbal S.A.T. score of 270 and a math S.A.T. score of 380. UMCP has not presented evidence of the percentage (in relation to all graduating high school seniors in Maryland) of African–American students who have met all four of these requirements, and thus, according to plaintiff, UMCP has not met its burden of proving that African–American students are underrepresented in the student body.

An affidavit submitted by UMCP's Director of Admissions as well as the University's published Policy on Admissions, establish that, in fact, the University does not have rigid minimum admissions requirements. Def.Ex. 9, ¶ 6. Def.Ex. 108. Thus, the class of potential applicants defined by plaintiff is artificial. Focusing upon the 1991–92 year— the period for which the most extensive data is available—UMCP recites a number of sta-

---

**52.** Plaintiff also argues that UMCP's reputation in the African–American community is no worse than the reputation of any other predominantly white university, whether or not it has a history of *de jure* segregation. Thus, plaintiff claims, it is impossible to link UMCP's bad reputation to its past discrimination rather than to some present societal force that affects both northern and southern universities. For the reasons stated below, *infra* section IV.B.2, I find this comparative argument to be wholly without merit.

tistics suggesting that the relevant reference pool should be much larger. Those statistics demonstrate that (1) 27.1% of the graduating high school seniors in Maryland were African–American, (2) 22% of the students taking the S.A.T. in Maryland were African–American, (3) 17.9% of the students who graduated with a course curriculum meeting the University's general requirements were African– American, (4) 18.1% of all Maryland S.A.T. takers who scored over 380 on the math S.A.T. were African–American and (5) 19% of all Maryland S.A.T.-takers who scored above 270 on the verbal S.A.T. were African–American.[53] In contrast, 13% of the incoming freshmen at UMCP in 1991 were African– American.[54] Def.Int.Ex. 37.

**53.** The 1991 statistics are the only ones in the record showing the percentage of Maryland high school graduates who were African–American, the percentage of S.A.T.-takers who were African–American, and the percentage of African– American high school graduates who met UMCP minimum course requirements. The percentage of African–Americans with minimum S.A.T. math scores are as follows: 1992 (14.6%); 1991 (18.-1%); 1990 (16.3%); 1989 (16.1%); 1988 (15.-5%). The percentage of African–Americans with minimum S.A.T. verbal scores are as follows: 1992 (18.5%); 1991 (19%); 1990 (17.3%); 1989 (16.8%); 1988 (16.5%). The percentage of Maryland's high school graduates graduating with a G.P.A. greater than 2.0 are as follows: 1992 (21.1%); 1991 (21.51%); 1990 (19.6%); 1989 (19.14%); 1988 (18.75%). *See* Def.Exs. 21–27.

Using these various applicant pools, defendant-intervenors employ standard deviation analysis to determine if the disparity between the pools and the percentage of black students entering UMCP in any particular year is simply the product of random chance or the product of racial discrimination. In other contexts, the Supreme Court has found that standard deviations that are "greater than two or three" give rise to an inference that the disparities are caused by racial discrimination. *Hazelwood School Dist. v. United States*, 433 U.S. 299, 307, 97 S.Ct. 2736, 2741, 53 L.Ed.2d 768 (1977); *Castaneda v. Partida*, 430 U.S. 482, 496 n. 17, 97 S.Ct. 1272, 1281 n. 17, 51 L.Ed.2d 498 (1977).

Here, the standard deviation analysis conducted by defendant-intervenors on UMCP's incoming freshmen for the last five years, reveals gross disparities when the percentage of African–American freshmen at UMCP is compared to the pool of black high school graduates, black high school graduates who took the S.A.T., black high school graduates completing the minimum course requirements, and black high school graduates with a G:P.A. of 2.0 or higher. Def–Int. Reply at 23. *See also*, Def–Int.Ex. 37. These disparities range from 3.4 (the deviation between the percentage of black high school graduates with a G.P.A. of 2.0 or higher and the percentage enrolled at UMCP in 1989) all the way up to 17.3 (the deviation between the percentage of black high school graduates who took the S.A.T. and the percentage enrolled at UMCP in 1992). *Id.* All the deviations are above the "two or three" considered by the Supreme Court to be "gross". Indeed, even using the narrower pools that plaintiff suggests, defendant-intervenors' analysis reveals gross disparities for certain years. Using

the pool of black high school graduates with verbal S.A.T. scores above 270 yields gross disparities in 1988 (4.4), 1990 (3.8), 1991 (6.4) and 1992 (9.3). Def–Int.Ex. 37. Using the pool of black students with math S.A.T. scores above 380 yields gross disparities in 1988 (3.1), 1991 (5.4), and 1992 (5.0). *Id.*

**54.** Plaintiff also argues that defendants' claims of underrepresentation fail to take into account the fact that 25% of UMCP's freshman class comes from out of state and thus from an applicant pool with a smaller percentage of African–Americans. This argument is erroneous for several reasons, ranging from the specific to the general. First, in making their standard deviation calculations, defendant-intervenors compare only African– American freshmen of in-state origin to the in-state applicant pool. Def–Int.Exs. 25, 26, 27, 37. Out-of-state black freshmen and the out-of-state applicant pool are completely factored out of the equation. Thus, they do not inflate the degree of underrepresentation. Second, plaintiff's use of the percentage of African–Americans enrolled in the first year of college throughout the country as a proxy for the out-of-state applicant pool is tautological. It assumes that the pool of applicants is the same size as the number who eventually matriculate. Thus it assumes that there is no discrimination. Third, plaintiff's use of a national figure also disguises the fact that UMCP takes a majority of its out-of-state students from five jurisdictions. In 1985, 59% of out-of-state students at UMCP come from the District of Columbia (6%), New Jersey (15%), New York (17%), Pennsylvania (11%), and Virginia (10%). Def–Int.Ex. 38. With the exception of Pennsylvania, each of these states, as well as the District of Columbia, have black populations that exceed the national average. Pl.Ex. 60, table 8. Since he has not taken these region variations into account, plaintiff has not met his burden of presenting material evidence to substantiate his claim that there is no underrepresentation at UMCP. Finally, plaintiff's argument fails to recognize that although the Banneker Program's remedial purposes are served by attracting African–Americans to UMCP from outside of Maryland, *see infra* note 74, it is entirely reasonable for the University to set enrollment goals in relation to its responsibility to educate the citizens of Maryland.

There is a danger (created in part by the images of microscope and magnifying glass which the term "strict scrutiny" brings to mind) that a judge will become myopic when confronted with statistics such as these and assume that a single reference pool must be selected. In fact, such a narrowing of perspective is neither necessary nor proper.[55] Rather, the judge should look at the statistics as a whole to determine if they provide strong evidence of the existence of present effects of past discrimination.

Here, minimum admission requirements, even though subject to waiver in particular cases, cannot be entirely disregarded. If UMCP did not consider the qualifications of applicants, it would inflate its admission rates but doom its attempts to increase its retention and graduate rates to failure. On the other hand, the admissions process contains too many variables to define the reference pool by inflexible objective criteria which, in fact, are not mechanically applied by the University. Moreover, use of a pool defined exclusively by a high school G.P.A. and S.A.T. results would itself disguise the fact that the substandard, segregated education of many parents of the current generation of African–American students directly impacts the G.P.A.s and S.A.T. scores of UMCP's current black applicants.[56] Education is a continuous and expanding process in which knowledge, skills and attitudes towards learning are communicated from one generation to another. Unfortunately, we still live in a time when many African–Americans of college age are disadvantaged in this respect because their forbears received an inferior education under Maryland's segregated school system, of which UMCP stood at the top.

Considering the evidence as a whole, I have no difficulty in finding a strong evidentiary basis for UMCP's finding that African–American students are underrepresented at College Park. The 27.1% figure relating to all graduating high school seniors would not be an appropriate benchmark because it does not take into account even flexible minimum admission requirements. On the other hand, the unknown figure advocated by plaintiff based upon strict numerical scores is likewise an improper measure since it ignores the variables in the admissions process and the intergenerational effects of segregated education on the applicant pool. Using the 1991–92 school year as the prototype, the remaining scale of percentages ranges from 17.9% (percentage of African–Americans meeting general course curriculum requirements) to 22% (the percentage of African–Americans taking the S.A.T.). All of these compare unfavorably to the percentage (13%) of incoming freshmen at UMCP who were African–American that year.[57] Moreover, it is improper to analyze the statistics for any single year—the dimension of time must be considered. Thus, it cannot be forgotten that although UMCP in recent years has made substantial efforts to increase the number and percentage of African–Americans whom it enrolls as freshmen, it was not until 1983 that the percentage reached 10% and not until 1989 that it reached 15.8%. It has fluctuated since that time.[58]

**55.** I am aware that other courts which have considered the constitutionality of affirmative action plans have selected a single pool of qualified applicants in order to determine if historically there has been underrepresentation in a given class. *See, e.g. Contractors Association of Eastern Pennsylvania, Inc. v. City of Philadelphia*, 6 F.3d 990 (3d Cir.1993); *Stuart v. Roache*, 951 F.2d 446 (1st Cir.1991); *Peightal v. Metropolitan Dade County*, 940 F.2d 1394 (11th Cir.1991); *Donaghy v. City of Omaha*, 933 F.2d 1448 (8th Cir.1991). However, these cases have all arisen in the employment context. Not only do I consider them as generally being of only marginal precedential value in education cases, *see infra* section VI.A., I also find them to be particularly distinguishable when selecting an applicant pool since the college admissions process involves so many variables. In the education context use of a sliding scale reflecting at least some of those variables is more reasonable and appropriate.

**56.** Def–Int.Ex. 29 at 2.

**57.** Additionally, when a standard deviation analysis is conducted on these pools as compared to the percentage of incoming African–Americans, the deviations are "gross." Def–Int.Ex. 37. *See supra* note 53.

**58.** The percentage of first-time full-time freshmen at UMCP who are African–American in each year since 1974 (when the statistic was first kept) is as follows: 1974—6.6%; 1975—9.4%; 1976—8.8%; 1977—9.0%; 1978—7.9%; 1979—7.4%; 1980—8.9%; 1981—8.6%; 1982—9.6%; 1983—

### 2. Comparison with northern institutions

■ Plaintiff further argues that since the percentage of black undergraduates at UMCP is comparable to the percentage at public universities in states that "have not had segregated higher education systems", it is impossible to prove that the underrepresentation at UMCP is related to its past discriminatory acts as opposed to some present societal condition that affects both northern and southern universities.

Plaintiff's argument is flawed for several reasons. First, universities are not fungible. Each has its own institutional history, and plaintiff has presented no evidence concerning the histories of the universities he alleges to be comparable. Second, most of the states whose universities plaintiff alleges are comparable to UMCP have smaller black populations than does Maryland. Thus, the fact that Maryland's percentage of enrollment exceeds theirs is of little import.

Most importantly, plaintiff's assertion that northern universities do not have a history of segregation is unproven and wrong. While northern states did not have *de jure* segregation, the admissions policies of nearly every northern college and university excluded African-Americans from college campuses almost as effectively as the legal requirements of segregation in southern states. Between 1826 and 1910, only 693 blacks were graduated from predominantly white colleges.[59] This minuscule number was not due to a lack of qualified candidates. By 1930, predominantly black colleges were graduating approximately 19,000 students a year. Even the City College of New York, which had no admissions requirements and an institutional mission to serve the poor, had only two black graduates by 1910.[60] In fact, the vast majority of predominantly white colleges did not begin admitting African-Americans until after World War II.[61] Even after the Second World War, northern colleges admitted only a tiny quota of black students each year. By 1954, African-Americans made up only 1% of freshmen at predominantly white institutions.[62] This percentage did not increase above 2% until the late 1960s.[63]

Not surprisingly, the tiny portion of black college-goers who matriculated at predominantly white institutions before the late 1960s found themselves in profoundly inhospitable environments, even at the most "progressive" liberal arts colleges. Forced to live in segregated housing, excluded from white social events and institutions, and often banned from participating in intercollegiate athletics, African-Americans at northern universities led lonely, secluded lives.[64] As George Davis, an African-American writer and educator, wrote about the life of a black student at a small liberal arts college: "[F]or four years he had felt distant and detached in this fragile, alien environment.... [T]he white students looked the same as the ones he had known.... They were still the same healthy, unmenaced children of the rich that made his life so lonely for four years." [65]

Considering this extensive record of *de facto* discrimination on northern college cam-

10%; 1984—9.6%; 1985—10.5%; 1986—12.1%; 1987—12.5%; 1988—13.6%; 1989—15.8%; 1990—15.0%; 1991—13.0%; 1992—11.3%; 1993—15.3%.

**59.** Blassingame, Comment, in *The Rockefeller Foundation Working Papers on Bakke, Weber and Affirmative Action* at 208 (1979). Ballard, *The Education of Black Folk* at 52 (1973).

**60.** Flemming, "Black Students in Higher Education to 1954" in Thomas ed., *Black Students in Higher Education* (1980). Ballard, *supra* note 59, at 52.

**61.** Alexis, "The Effect of Admissions Procedures on Minority Enrollment in Graduate and Professional Schools," in *Rockefeller Foundation Working Papers* at 53.

**62.** Blassingame, *supra* note 59, at 209. Ballard, *supra* note 59, at 52.

**63.** Mingle "The Opening of White Colleges and Universities to Black Students," in Thomas at 24. Ballard, *supra* note 59 at 60–80.

**64.** Mingle, *supra* note 63, at 22. Ballard, *supra* note 59, at 54–56.

**65.** Quoted in Ballard, *supra* note 59, at 54. Pre-eminent civil rights lawyer Charles Hamilton Houston had similar feelings of loneliness and alienation at Amherst College during the mid-nineteen teens and at Harvard Law School during the 1920s. McNeil, *Groundwork: Charles Hamilton Houston and the Struggle for Civil Rights* at 31–32, 51–52 (1983).

puses, plaintiff's comparison of UMCP to its peer institutions in the north fails to prove that the University has no present effects of past discrimination. Both northern and southern institutions of higher education have practiced discrimination against African–Americans. Thus, the argument that, as far as racial issues are concerned, UMCP is more like a northern university than a southern one, even if assumed to be true, does not eliminate the possibility that racial problems at College Park are the present effects of past discrimination. To the contrary, there is no reason to assume that, considering their history of discrimination, northern universities are not themselves now experiencing the present effects of past discrimination.

## C.

The third present effect of past discrimination that UMCP has found is that African–Americans have a disproportionately high attrition rate. I hold that there is a strong evidentiary basis for this finding. The attrition rate for African–American students at UMCP is substantially higher than it is for students who are not African–Americans. For example, for freshmen entering UMCP in 1989, only 62.4% of the black freshmen remained at College Park after three years in comparison to 74.5% of the white freshmen and 73.4% of the total 1989 freshmen population. Even larger disparities exist with respect to the relative graduation rates of African–Americans and other groups. For freshmen entering UMCP in 1986, only 42.5% of the black freshmen graduated after six years in comparison to 66.5% of the white freshmen and 63.5% of the total 1986 freshmen population. No other identifiable group at the University has such low retention and graduation rates. Def.Exs. 35–41.

Plaintiff does not challenge the accuracy of these statistics. Rather, he argues (as he does elsewhere) that since the retention and graduation rates at UMCP are comparable to those at northern universities that have no history of *de jure* segregation, they cannot be said to be an effect of the University's past discrimination. This argument fails for the same reason as it does in other contexts: it is based upon the erroneous assumption that there was no *de facto* segregation at northern universities. *See supra* section IV.B.2. Plaintiff also suggests that low African–American retention and graduation rates can be explained by the fact that, because of an admissions preference given to African–American's in UMCP's admissions process, blacks who get into the University are generally less qualified than whites. However, the record establishes that even controlling for S.A.T. scores, African–American retention and graduation rates are lower than white retention rates; given a group of people with the same S.A.T. scores, a higher percentage of blacks drop out than whites. Def.Ex. 114, table 12.

Left unexplained by plaintiff, the low retention and graduation rates among African–American students stand as perhaps one of the strongest testaments to the continuing racial problems which UMCP faces. If no effects of past discrimination remained, one would expect the relative retention and graduation rates of blacks and non-blacks to approximate one another. Undoubtedly, one of the factors that contributes to the high attrition rate among African–American students is that many of them are less wealthy than their white counterparts and cannot continue their education at the University because of financial hardship. Plaintiff would argue that, despite the adverse impact of educational deprivation upon employment opportunities, this is of no moment because economic disparity among the races is an effect of "societal discrimination" which UMCP is not permitted to remedy by a race-based scholarship program. *See Croson,* 488 U.S. at 498–500, 109 S.Ct. at 723–25; *Wygant* 476 U.S. at 274–76, 106 S.Ct. at 1847–48. Even assuming this to be true, it is not only financial hardship that leads students to leave college before graduation. In given cases an absence of commitment to the school because of its poor reputation in the community from which a student comes, the lack of shared experience with family members to help the student through the arduous process of higher education, the absence of African–American members of the faculty to serve as men-

tors[66] and the existence of a hostile racial atmosphere on campus are other significant contributing factors. Def.Ex. 114. These conditions are all directly attributable to Maryland's history of segregated education of which UMCP was an integral part.

### D.

The fourth present effect of past discrimination which UMCP has found to exist is a prevailing perception that the climate on the College Park campus is hostile to African Americans. Again, there is a strong evidentiary basis in the record to support this finding.

A study commissioned by the University in 1989 (before plaintiff filed this suit) concluded that there is a "chilly climate for Blacks at UMCP" manifested by complaints of racism made to the University's Office of Human Relations, by overtly racist comments by faculty and teaching assistants, by the lack of African–American leaders on campus, and by the failure of campus media entities to cover the accomplishments of black faculty, staff, and students. Def.Ex. 17 at 10–16. Responding to this report, the University commissioned an in-depth study of race relations on campus. An overwhelming majority of black students (86%) surveyed said that race relations between students were a problem at UMCP and 89% of these students said it was a very serious or somewhat serious problem. A smaller majority of white students (56%) said that race relations were a problem on campus. Def.Ex. 34 at 111. Other findings indicated that there was a perception that anti-black behavior was frequently exhibited on campus:

—82% of black respondents (including both faculty and students) and 68% of white respondents reported observing "racial role stereotyping of black students by students often or sometimes."

—50% of black students and 29% of white respondents reported that they have observed hostility by students towards black students often or sometimes.

—34% of black students and 20% of white students reported observing often or sometimes exclusion of black students from social events "because of race."

*Id.*

The student focus groups conducted by Dr. Feagin yielded similar results. Eighty-nine percent of the students Feagin interviewed "disagreed" or "tended to disagree" with the statement: "the University of Maryland at College Park is a college campus where black students are generally welcomed and nurtured." Feagin Report II, at 10. Comments by students in these focus groups evidenced the existence of condescending attitudes and mistreatment by faculty members,[67] and casual use of racial epithets by students.[68] Another student reported simply feeling invisible on campus:

So I got my yearbook ... [a]nd I'm going through it and I'm not seeing very many black people and the one—they had a picture of like I think blacks in pre-med. That was the only black scholastic organization that they had. They had two pages for the homecoming step show, that was about it. They did their traditional dorm life, students moving in, all this for white students like I guess black students didn't move in. They, like, landed on the roof

---

**66.** In 1989, the most recent year for which there are statistics in the record, African–Americans made up 3.8% of UMCP's faculty. Def–Int.Ex. 21, table 24.

**67.** "A lot of my teachers and students handle me with kid gloves.... I'm like 'Give me the truth the way it is an I'll deal with it and give it back to you.' But that's what I don't like. I can tell when they're being patronizing and that happens a lot so I just deal with it." Def.Ex. 13 at 14. Other students reported not getting into classes or having their questions dismissed because they were black. *Id.* at 18, 25.

**68.** "[M]y best friend was a white guy, and he's in the Greek system and that's like what I think is a racist thing about campus. And I went to a party the other day, and one of his brothers got mad I was there. Well he just said "I just got rid of some little black [epithet]." Def.Ex. 13 at 15. "[O]nce I was down on Route 1 ... and somebody yelled 'nigger' out of the car. And I was like "oh, what am I supposed to do?" *Id.* at 16. "Last year, while walking to the campus dining hall with a group of fellow African–American female classmates, a group of white males came up behind us and made several lewd sexual comments to us, specifically focused on the fact that we were black women." Def.Ex. 48, ¶ 11.

and snuck in, into the dorms.... But yet it's part of the yearbook. You know, glorifying their life and their recreational activities, and where black students aren't even represented in the yearbook.

*Id.* at 18.

A segregated atmosphere continues to permeate UMCP's campus. Students segregate in the dining halls and classrooms, and African–American students feel that they are not welcome at fraternity parties, bars, and the student newspaper. Detrick, *Still Suffering from Racism,* UMCP Diamondback, April 26, 1989 at 1. Def.Ex. 13 at 23. Def.Ex. 7 at 23. Def.Ex. 90, ¶ 3. Def.Ex. 13 at 11. Separate homecomings exist for whites and blacks. Def–Int.Mem. at 44. Academic segregation also exists, with very few black students getting degrees in the sciences and other technical fields. Def.Ex. 43, table 16 (showing that African–American comprise only 1% of the degrees awarded in mathematics, architecture, and the physical sciences).

In the face of this evidence of an adverse racial climate at UMCP, the main dispute between the parties is as to whether this climate is the result of the University's past discriminatory acts. Several of the experts who testified before the University's administrative hearing linked UMCP's adverse racial climate to its history of *de jure* and *de facto* segregation. Def.Ex. 18 at 28. Def.Ex. 13 at 2–3. Def.Ex. 14 at 12, 25. Even more convincing evidence of the historical origin of UMCP's adverse racial climate is provided by the stream of racial incidents that have continuously marred the University since *de facto* segregation ended in the early 1970s. Professor William Sedlacek examined UMCP's school newspaper from 1970 to 1991 and kept count of articles, commentary and letters to the editor that had "negative impli-

cations" for African–American students. These included reporting on racist incidents, racist letters to the editor and articles, commentary and letters highlighting black academic failure, preferential treatment, and social isolation.[69] Def.Ex. 15 at 38–40.

The quantity and regularity of these articles and the fact that they have continued unabated since UMCP began desegregating strongly suggests that the University's adverse racial climate is a legacy of its past discriminatory practices. *Cf. United States v. Fordice,* —— U.S. ——, —— n. 4, 112 S.Ct. 2727, 2736 n. 4, 120 L.Ed.2d 575 (1992) (holding that continuing racial identifiability is probative as to whether a state has dismantled its segregated system of higher education). Universities necessarily have cultures that span several entering classes, and generations of college students cannot be separated from one another. The very nature of the college experience is that younger students learn from older ones. Accordingly, the causes of a hostile racial climate cannot be divided into discrete cabined units, as plaintiff seeks to do. Since 1970, both black and white students have been handing down racial attitudes that perpetuate a hostile racial climate.

Even if the continuous stream of racial incidents is not enough to link UMCP's present racial climate with past discrimination, a close examination of the sources of racial tension on campus reveal that they are intimately related to UMCP's past discrimination. Many of the disputes between white and African–American students since the end of *de facto* segregation have been over UMCP's attempts to integrate or its failure to do so. As the University has attempted to equalize the funding between black student organizations and white student organiza-

69. Plaintiff considers these articles to be evidence of a "robust discussion of race." Pl.Reply at 47. This comment indicates that plaintiff misses the point of Professor Sedlacek's thesis. Sedlacek is not saying that the discussion of racial issues on campus is bad from an intellectual perspective. He is instead arguing that when these issues are discussed, African–Americans are consistently portrayed in a negative light. Additionally, the fact that these issues continually appear in the campus newspaper—be that a good thing or not—has a negative impact on black

students' attitude about the racial climate at UMCP because they foster the impression that race is the most significant thing about an African–American student's persona at the University. In any event, Sedlacek's study indicates a depressing number of items appearing in the newspaper that are not "a robust discussion of race" but are instead manifestations of outright racism at UMCP, including letters from the Ku Klux Klan and reports of racial epithets being shouted at anti-apartheid protesters. Def.Ex. 15 at 23–33.

tions, white students have lashed out at black students.[70] When the University has taken actions that the African–American community at College Park perceives as scaling back desegregation, African–Americans have lashed out at the University.[71] If the University had not been segregated, if it had always supported black and white fraternities and sororities equally, and if it had funded the cultural activities of all groups on campus equally, then there would be no need for the present day actions that the University must take to rectify these problems which are contributing to racial tension.[72]

## V.

■ In my earlier opinion I found that the Banneker Program is "narrowly tailored" to remedy the effects of past discrimination that continue to exist at UMCP. In its opinion the Fourth Circuit did not reach that issue. However, it questioned in passing the scope of the Program, indicating that while "the program may be valuable as a recruitment tool, ... the value of the much-expanded program, as opposed to the program in its more limited form or other non-race-based remedies, is not clear." *Podberesky v. Kirwan*, 956 F.2d at 57 n. 7.

In *United States v. Paradise*, 480 U.S. 149, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987), the Supreme Court established a framework for addressing the "narrowly tailored" question. It identified four criteria by which to judge

the nexus between a remedial plan and the interest it purports to serve: "the necessity for relief and the efficacy of alternative remedies; the flexibility and duration of the relief, including the availability of waiver provisions; the relationship of the numerical goals to the relevant labor market; and the impact of the relief on the rights of third parties." 480 U.S. at 171, 107 S.Ct. at 1066. I will briefly consider each of these factors.

### 1. *The Necessity For Relief And The Efficacy Of Alternative Remedies*

UMCP's finding that the consequences of its segregative past continues to be felt *ipso facto* establishes the necessity for relief. However difficult other issues in this case may be, no one would contend that a public university may simply ignore present effects of past discrimination for which there is a strong evidentiary basis. Similarly, it cannot be seriously contended that the Banneker Program is not extremely effective in remedying the problems which UMCP has found to exist. By attracting high-achieving black students to the UMCP campus, the Program directly increases the number of African–Americans who are admitted and likely to stay through graduation. Even more importantly, the Program helps to build a base of strong, supportive alumni, combat racial stereotypes and provide mentors and role models for other African–American students.[73] Con-

---

70. See, e.g., Def.Ex. 70 at 165, 166, 168–70. Crowley, *What About Poor Whites?* UMCP Diamondback, March 3, 1980 at 4. Patterson, *Delegates Lodge Protest of BSU–Sponsored Event*, UMCP Diamondback, February 8, 1982 at 1. *Lift the Veil*, UMCP Diamondback, February 23, 1983 at 4. Lake, *Hard Work Makes You Free*, UMCP Diamondback, April 12, 1988 at 4. Bennett, *Needy Minority Students Benefit from Banneker Scholarships*, UMCP Diamondback, June 20, 1991 at 1.

71. See, e.g., Def.Ex. 70 at 211–14, 219–22, 228–30. Green, *What About Blacks?* UMCP Diamondback, September 6, 1973 at 4. Malloy, *Legislators Hear Blacks' Gripes*, UMCP Diamondback, March 7, 1977 at 1. Thomas, *Blacks Decry Gonzalez Remarks*, UMCP Diamondback, January 23, 1979 at 1. Humphreys, *Black Group Hits Graduate Dean Search*, UMCP Diamondback, April 23, 1980 at 1. Gonzales, *BSU Protests Hiring Policies*, UMCP Diamondback, March 4, 1982 at 1.

72. Here, plaintiff also makes his usual comparative argument: that since the racial climate at certain northern universities is hostile, defendant cannot prove that UMCP's adverse racial climate is related to its past segregation. For the reasons I previously stated, I consider this argument to be without merit. *See supra* section IV.B.2.

73. In *Wygant*, the Court held that a "role model theory" was an impermissible basis for an affirmative action program. 476 U.S. at 276, 106 S.Ct. at 1848. However, the program that the Court struck down in *Wygant* used role models in an attempt to alleviate what the Court considered to be societal discrimination. *Id.* at 274, 106 S.Ct. at 1847. In this instance, the role model function of the Banneker scholars is directly related to eliminating specific present effects of past segregation. Role models are being used as a tool to combat the present effects of UMCP's past illegal acts.

tinuation of the Program thus serves to enhance UMCP's reputation in the African–American community, increase the number of African–American students who might apply to the University, improve the retention rate of those African–American students who are admitted and help ease racial tensions that exist on the campus.

UMCP has considered the two alternatives which plaintiff espouses and has concluded that they would not be nearly as effective as the Banneker Program in remedying the problems that continue to exist. The first of these alternatives—a race-blind merit-based scholarship program based upon conventional criteria such as high school G.P.A. and S.A.T. scores—would not result in a sufficient number of African–American students receiving scholarships to have the necessary curative effects. This fact is established conclusively by UMCP's experience with the Key Scholarship Program which is race-neutral and merit-based. In 1992, out of thirty-six Key Scholarships awarded, African–Americans received two, Asian Americans received ten, Hispanics received one and whites received twenty-three. In 1991 twenty-seven Key Scholarships were awarded: two to African–Americans, five to Asian–Americans, one to Hispanics and the remainder to whites. In 1990 fifty-two Key Scholarships were awarded; African–Americans received two, Asian–Americans received seven, Hispanics received two and whites received forty-one. In 1989, forty-seven scholarships were awarded: one to an African–American, three to Asian–Americans, two to Hispanics and forty-one to whites. Def.Ex. 9, ¶ 29.

The second possible alternative—expansion of need-based scholarships on a race-neutral basis—would likewise be ineffective in achieving the purposes for which the Banneker Program is designed. UMCP does not shy away from the fact that the Banneker Program is a recruiting tool. As analyzed by the University, its success in curing the vestiges of its past discrimination depends upon it attracting high-achieving African–Americans to the College Park campus.[74] Because such students often come from middle-class families and would not qualify for financial assistance, an increase in racially-neutral financial aid packages would lack the same remedial effect. Indeed, UMCP's experience with the Frederick Douglass Scholarship Program—which provides need-based awards solely for African–Americans—demonstrates that African–Americans meeting the Banneker qualifications are not drawn to College Park by such a need based program. Def.Ex. 1A at 49–50.

### 2. The Flexibility And Duration Of The Relief

The Banneker Program is not "flexible" to the extent that it is limited to African–Americans. This characteristic is by definition common to all affirmative action programs. Indeed, if a program were to benefit persons of a class that was not a victim of past discrimination, it would be unconstitutionally overbroad. In any event, even if the Banneker Program's racial exclusivity were to count against it under the Paradise criteria, it gives it the virtue of candor. It is far better to confront an issue forthrightly than disguise it by dishonest compromise. Here, providing scholarships to students who are not African–American would not serve the purpose of the Banneker Program, and formally opening the Program to all while limiting it in practice to a few would be a mere legal contrivance. It is by such stratagems that institutional integrity is undermined.[75]

---

**74.** Plaintiff suggests that the Banneker Program is not "narrowly tailored" because it awards scholarships to African–Americans from outside of Maryland. Although it obviously would be preferable to award Banneker Scholarships to Maryland African–Americans who meet the necessary requirements, the Program's purposes of increasing the number of African–American role models and mentors on the campus, of breaking down cultural barriers and combating racial stereotypes are served regardless of whether Banneker scholars are Maryland natives or not.

**75.** Plaintiff makes much of the fact that in its original form the Banneker Program was open to all minorities. The record establishes, however, this aspect of the original program stemmed from legal advice that the Banneker Program could not be sustained if it were restricted to African–Americans. However sound at the time it was given, this advice has now been overridden by subsequent case law that permits race-conscious remedies where past discrimination warrants.

As to the question of duration, in its *Decision and Report* UMCP stated that "while it assumes that remedying past discrimination and achieving a racially diverse campus community will remain one of its objectives for the foreseeable future, it does not assume that the Banneker Program must be a perennial feature." *Decision and Report* at 53. UMCP is required to review the Program periodically, at least once every three academic years, for the purpose of determining whether the conditions which it is intended to redress persist and whether it is being effective in attaining its goals. To ask more of the University would be unreasonable. It does not possess a crystal ball that would enable it to predict the precise year in which it will overcome its segregative past. Attitudes cannot be changed overnight, and the temporal scope of an effective remedy cannot be arbitrarily defined. Rather, a curative program must be evaluated over time in the context of the institution's changing environment. The regular review process which UMCP has imposed upon itself will assure that such evaluation will occur.

### 3. The Propriety Of The Program's Numerical Goals

In measuring the propriety of the Banneker Program's numerical goals, this court is supposed to compare the number of Banneker Scholarships to the "relevant labor market." *Paradise*, 480 U.S. at 171, 107 S.Ct. at 1066. Since the number of scholarships given is small, the Banneker Program satisfies this inquiry. If the relevant labor market is incoming freshmen—who number approximately 3100—and the number of scholarships given is in the high twenties, then less than 1% of the "labor market" receives a scholarship. Def.Ex. 72. Def.Ex. 7 at 145–58. This percentage is small compared to any of the possible goals that the parties have bandied about, be it the 27.1% figure (percent of black high school graduates), 17.9% figure (black high school students who have met the core curriculum requirements) or even 14.6% (black students scoring above 370 on the math S.A.T.).

### 4. Impact Of The Program On The Rights Of Third Parties

Perhaps the greatest strength of the Banneker Program is that it is designed to remedy the effects of past injustices to African–Americans without interfering with the rights of others in the process. Banneker scholarships are awarded only after admission decisions are made, and they thus have no effect upon whether a student who is not African–American is able to attend UMCP. Further, the Program consumes only 1% of the total financial aid budget at the University. Thus, while I ruled in *Podberesky I* that plaintiff has suffered a legally cognizable harm sufficient to confer standing upon him, neither he nor any other non-Banneker student has suffered any appreciable monetary loss from the award of Banneker scholarships.[76] At bottom, the only damage to plaintiff is the insult to his sensibilities

---

**76.** UMCP's Director of Admissions has stated by affidavit that if the Banneker Program were discontinued, the funds which it utilizes would not be placed into general scholarship funds but would be channeled into other desegregation programs. Def.Ex. 9, ¶ 34. In that event, destruction of the Program would provide no monetary benefit at all to plaintiff or others similarly situated to him. In any event, the Supreme Court has recognized that in affirmative action programs "innocent persons may be called upon to bear some of the burden of the remedy," and that as long as these burdens are not "undue" or "unacceptable" the program will pass constitutional muster. *Wygant*, 476 U.S. at 280–81, 106 S.Ct. at 1850; *Metro Broadcasting v. F.C.C.*, 497 U.S. 547, 598, 110 S.Ct. 2997, 3026–27, 111 L.Ed.2d 445 (1990), *Paradise*, 480 U.S. at 182, 107 S.Ct. at 1072. The minimal burden imposed on nonminorities by the Banneker Scholarships meets this standard. Amounting to less than 1% of UMCP's financial aid budget, the removal of the Banneker Scholarship funds from the general pool of financial aid awards has a negligible impact on third parties applying for aid. Def.Ex. 1A at 52–53. Def.Ex. 59, ¶ 26. *See, e.g., Metro Broadcasting*, 497 U.S. at 598, 110 S.Ct. at 3026–27 ("we disagree that the distress sale policy imposes an undue burden on nonminorities. By its terms, the policy may be involved at the Commission's discretion only with respect to a small fraction of broadcast licenses...." (emphasis added); *Fullilove v. Klutznick*, 448 U.S. 448, 484, 100 S.Ct. 2758, 2777, 65 L.Ed.2d 902 (1980) (holding that the burden on nonminorities caused by a 10% minority set aside program was "relatively light"). Thus, even if plaintiff and others like him did suffer a slight financial injury, this would not render the Banneker Program unconstitutional.

caused by the continuation of a program which he believes to be wrong in principle. However sincere his views in that regard may be, the harm which he suffers is far outweighed by the needs and goals the University has articulated.[77]

## VI.

Having found that there is a strong evidentiary basis for finding that present effects of past discrimination exist at UMCP, I have completed the task which the Fourth Circuit has asked of me on remand. During the course of writing this opinion, however, I have reached the conclusion that in our earlier opinions both I and the Fourth Circuit may have constructed too rigid a framework of analysis. Because I have come to believe that (1) precedents involving employment disputes provide imperfect analogies for determining the constitutionality of an affirmative action program in the education context, and (2) focusing solely upon past discrimination in education cases blurs vision and obstructs understanding, I feel compelled to add a few words.

## A.

The standard that the Fourth Circuit and I have heretofore used in this case—that there must exist a strong basis in evidence of present effects of past discrimination—finds its genesis in the context of employment discrimination. *See, e.g., Croson,* 488 U.S. 469, 109 S.Ct. 706; *Wygant,* 476 U.S. 267, 106 S.Ct. 1842.[78] Reflexive use of the same standard in the education context fails to acknowledge that the Supreme Court has consistently recognized that discrimination in schooling is the most odious form of discrimination.

In *Brown v. Board of Education* the court held that: "[e]ducation is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education in our democratic society." 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954). Because of the paramount importance of public education in our society, the Court has created aggressive affirmative duties in the area of primary and secondary school desegregation (*Keyes v. School District No. 1,* 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973); *Green v. New Kent County School Board,* 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968)) and a presumption that the effects of the segregation continue until a court finds otherwise. *Board of Education of Oklahoma City v. Dowell,* 498 U.S. 237, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991). The primary importance of education also explains why the Supreme Court and various lower courts are willing to consider remedies that encompass a state's entire system of higher education as opposed to a single school. *United States v. Fordice,* ―― U.S. ――, 112 S.Ct. 2727. *United States v. Louisiana,* 815 F.Supp. 947 (E.D.La.1993). *Knight v. Alabama,* 787 F.Supp. 1030 (N.D.Ala.1991).

Thus, the various restrictions that the Court has applied to affirmative action programs in the employment context—particularly the prohibitions against remedying the effects of "societal discrimination", or discrimination that was done by another "governmental unit"—appear inappropriate in the education context where the effects of past discrimination are obviously societal in

---

**77.** I do not intend to demean plaintiff's concerns. An instinct for equal treatment lies at the heart of the idea of justice. Indeed, many Americans or their forebears came to this country for the very purpose of escaping systems of group preference and privilege which deprived them of individual opportunity. I also do not suggest that affirmative action programs, however moderate, are a panacea for remedying past ills. The concept that history is progressive by nature is an illusion, and over time affirmative action programs may prove to be counterproductive. This will be particularly true if they reenforce the stereotype that African–Americans succeed only because of

special favor and generate sustained resentment among those not benefitted by them. UMCP, has, however, itself recognized this potentiality, *Decision and Report,* at 45, and no doubt will be cognizant of it as it conducts it periodic review of the Banneker Program.

**78.** Indeed, with the exception of *Regents of the University of California v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), all the extant jurisprudence on affirmative action was created in employment discrimination cases.

scope.[79] Indeed, the Court emphasized the broad social effects of education in *Brown:*

> [Education] is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today it is a principal instrument for awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he has been denied the opportunity of an education.

347 U.S. at 493, 74 S.Ct. at 691. A fire department's discriminatory hiring practices have little or no effect on the society at large. But discrimination in the nation's educational institutions has created a ripple effect that necessarily affects every aspect of our economy and society. Accordingly, it seems entirely proper that in order to cure these effects, legislatures and educational administrators be given more leeway in fashioning remedies that take into account the vast extent of the damage that has been done by our shameful legacy of involuntary segregated education.

### B.

Even if we ignore that legacy, in light of the vital role which public education plays in forming and transmitting values, why in a case such as this should the only relevant question be whether presently existing racial problems are traceable to specific acts of discrimination which have occurred in the past? Undoubtedly, our history contributes mightily to our prejudices, and it is at best naive and at worst disingenuous to suggest that a culture of bigotry inculcated over centuries can be erased by less than twenty years of ameliorative measures. But let us assume for the purpose of argument that each generation is, in fact, born cloaked in innocence and pure of soul. If effects of racism nevertheless appear on our university campuses, would it not be a paradox, the height of irony, that our educational institutions could not attempt to cure them because it is we, not our parents or grandparents, who are their source?

This is not to say that public colleges and universities should be given carte blanche to establish unrestricted affirmative action programs whenever university officials posit that a racial problem has arisen. Although slavery and Jim Crow laws make our heritage hypocritical, we are bound together by the ideal of equality—an ideal which race-conscious remedies tend to contradict. Therefore, any such remedies must be subjected to "strict scrutiny" by the courts.

Strict scrutiny is, however, a process, not a mere quantum of proof or other mechanical test. In the education context, it should, in my view, involve asking the following questions: (1) Does a nucleus of fact exist which can reasonably be interpreted as evidencing the effects of racism; (2) Did the officials responsible for addressing the problem engage in an open and deliberative decision-making process; (3) Did they articulate the reasons for their conclusion that a problem requiring correction exists; (4) Did they adopt a narrowly tailored remedy that has minimal impact upon the rights and interests of persons not benefitted by the remedy; (5) Was the decision-making body controlled by members of a race benefitted by the remedy;[80] and (6) Has provision been made for regular periodic review to determine the continued necessity and efficacy of the chosen remedy.

In this case the responses to these questions all support upholding the constitutionality of the Banneker Program. Whatever their exact cause may be, the poor reputation of UMCP among African–Americans, the low enrollment, retention and graduation rates for African–American students at College Park and continuing racial tensions on its campus all can reasonably be interpreted as

---

**79.** Even if it was held that the "governmental unit" restriction is applicable in the education context, it would be nonsensical to hold that institutions of higher education may not attempt to remedy past discrimination by primary or secondary schools. Systems of public education are just that—"systems." The schools within them are inextricably linked to one another.

**80.** *See Croson,* 488 U.S. at 495–96, 109 S,Ct. at 723.

constituting, at least in part, the effects of racism (present or past). In deciding to continue the Banneker Program, UMCP has engaged in a public process in which all sides were given an opportunity to be heard. The *Decision and Report* issued by UMCP fully articulates the basis for continuing the Program. The Program is narrowly tailored and has little (if any) impact upon the rights and interests of students who are not African–American. African–Americans do not control the decision-making process, and UMCP's *Decision and Report* provides that the Banneker Program is to be reviewed every three years for the purpose of determining whether it should be continued.

## VII.

Few issues are more philosophically divisive than the question of affirmative action. It strikes at our very souls as individuals and as a nation. It lays bare the conflict between our ideals and our history. The answers that we give to it today cannot be cast in stone, but must stand exposed, in all of their fragility, to the tests of time and experience. All that we can ask of those entrusted with the responsibility of running our institutions, both public and private, is that they approach the issue intelligently, sensitively and self-critically, without bias, self-interest or cant. This, the University of Maryland at College Park has done in establishing and resolving to continue the Banneker Program, and its judgment withstands the scrutiny to which the Constitution properly subjects it.

## AMENDED ORDER

For the reasons stated in the opinion entered herein, it is, this 22nd day of November 1993, as of the 18th day of November 1993,

ORDERED that

1. Plaintiff's motion for summary judgment is denied;

2. Defendants' motion for summary judgment is granted;

3. Defendant-intervenors' motion for summary judgment is granted; and

4. Judgment is entered in favor of defendants and defendant-intervenors against plaintiff.