Daniel J. PODBERESKY, Plaintiff–Appellant,

v.

William E. KIRWAN, President of the University of Maryland at College Park; University of Maryland, at College Park, Defendants–Appellees,

State of Ohio; State of Idaho; State of Illinois; State of South Dakota; State of Vermont; State of Virginia; State of West Virginia; N.A.A.C.P. Legal Defense and Education Fund, Inc., Amici Curiae.

No. 91–2577.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 31, 1991.

Decided Jan. 31, 1992.

---

Richard Abbott Samp, Washington Legal Foundation, Washington, D.C., argued (Daniel J. Popeo, Washington Legal Foundation, Washington, D.C., Samuel Podberesky, Randallstown, Md., on the brief), for plaintiff-appellant.

Andrew Howard Baida, Asst. Atty. Gen., Baltimore, Md., argued (J. Joseph Curran, Jr., Atty. Gen. of Md., Richard A. Weitzner, Gerard J. Gaeng, Asst. Attys. Gen., Baltimore, Md., on the brief), for defendants-appellees.

Janell M. Byrd, NAACP Legal Defense and Educational Fund, Inc., Washington, D.C., Julius LeVonne Chambers, Norman J. Chachkin, NAACP Legal Defense and Educational Fund, Inc., New York City, David M. Becker, Michael C. Small, Wilmer, Cutler & Pickering, Washington, D.C., for amicus curiae NAACP Legal Defense Fund.

Lee Fisher, Atty. Gen., of Ohio, Loren Braverman, Deputy Chief Counsel, Theresa Rittinger Schaefer, Asst. Atty. Gen., Columbus, Ohio, for amici curiae State of Ohio, et al.

Before WIDENER and HAMILTON, Circuit Judges, and RESTANI, Judge, United States Court of International Trade, sitting by designation.

OPINION

RESTANI, Judge:

Appellant, Daniel J. Podberesky, appeals from a grant of summary judgment entered on May 15, 1991. 764 F.Supp. 364. Appellees are the president of the University of Maryland at College Park ("UMCP") and UMCP itself, which maintains a race-based scholarship program from which appellant was excluded. Appellant sued for injunctive, declaratory and compensatory relief alleging violations of his rights under the Fourteenth Amendment and 42 U.S.C. §§ 1981, 1983 and 2000d *et seq.*

*Background*

Appellant is a nineteen year old Hispanic male who was admitted to UMCP in the fall of 1989. As an applicant to UMCP, appellant had an excellent academic record: his Scholastic Aptitude Test score was 1340, out of a possible 1600; his grade point average as calculated by his high school was over 4.0 (as calculated by UMCP, his grade point average was 3.56); and he actively participated in several extracurricular activities.

Along with his application to UMCP, appellant requested that he be considered for an academic scholarship.[1] UMCP main-

---

1. It should be noted that the race-based classification at issue relates to a non-need-based scholarship program voluntarily established by appellee. Thus, this situation is distinguishable from *Ayers v. Allain,* 914 F.2d 676 (5th Cir.1990) *(en banc), cert. granted sub nom. United States v. Mabus,* — U.S. —, 111 S.Ct. 1579, 113 L.Ed.2d 644 (1991), in which black citizens sought mandatory remedies for alleged vestiges of prior discrimination in various components of higher education in Mississippi including "student admissions standards and enrollment, university staff composition, institutional mission, provision and maintenance of facilities, allocation of financial resources, curricular offerings and placement of programs, operation of branch programs, allocation of land grant

tains several scholarship programs, one of which is the Benjamin Banneker Scholarship Program ("Banneker Program" or "Banneker Scholarship"), a scholarship program not based on need, under which a minimum of twenty scholarships are awarded each year. UMCP established the Banneker Program in 1978; however, for the first decade of its existence it was limited in scope. Originally, the program provided twoyear scholarships with stipends of $1,000 per year. In approximately 1985, the program was expanded to four-year scholarships. In 1988, the amount of the scholarship was increased to full instate tuition or out-of-state tuition, plus room, board and mandatory fees, worth in excess of $33,500 over the four years.

At the time appellant applied for the Banneker Scholarship, the minimum requirements for further consideration under the Banneker Program were a 900 Scholastic Achievement Test score and a 3.0 grade point average. Only students of African–American heritage are considered for the Banneker Scholarship.[2] Appellant's credentials exceeded those required for further consideration under the Banneker Program; nevertheless, appellant was not considered for this scholarship because he was not of African–American heritage.

The Banneker Program was intended as a partial remedy for past discriminatory action by the State of Maryland. For many years the State of Maryland maintained a system of higher education consisting of separate racially-segregated institutions.[3] After *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), Congress enacted Title VI of the Civil Rights Act of 1964 which forbids federal fund recipients from discriminating in any manner on the basis of race, color, or national origin. 42 U.S.C. § 2000d *et seq.* (1964). In 1969, the Office for Civil Rights ("OCR") of the Department of Health, Education, and Welfare (now the Department of Education) notified Maryland that its higher education system was still segregated in violation of Title VI. If OCR is unable to obtain compliance with Title VI, it is authorized to initiate formal administrative proceedings against the offending institution. OCR has never initiated formal proceedings against UMCP.

Between 1969 and 1974, Maryland submitted three desegregation plans to OCR. After rejecting the first two, OCR accepted the third plan in 1974. In 1975, the Acting Director of OCR informed the state that it was still in violation of Title VI. In 1978, OCR published new guidelines which set forth criteria required for preparation of acceptable plans for post secondary public education.

In 1980, Maryland adopted the *Equal Educational Opportunity Plan for 1980–1985* ("1980–85 Plan"), in which it attempted to meet the requirements of the 1978 guidelines. The 1980–85 Plan contained many goals, one of which was a freshmen class at UMCP that included between ten to twelve percent black students by the year 1985. The Banneker Program was not mentioned in this plan. In May 1985, UMCP specifically mentioned the Banneker Program to OCR when it submitted a "Black Undergraduate Recruitment Program." In June 1985, the State adopted the *Plan to Assure Equal Post Secondary Educational Opportunity 1985–89* ("1985–89 Plan"). In this plan, Maryland established a goal of fourteen percent black freshmen at UMCP by the year 1989. No

---

functions, and the composition of the Board of Trustees and its staff." *Id.* at 678.

**2.** Applicants not meeting this last criterion are still eligible to compete for the other merit-based, academic scholarship, the Francis Scott Key Scholars Program ("Key Program"). The Key Program provides benefits identical to those given under the Banneker Program to approximately 53 students. In order to be considered further under the Key Program, an applicant must have a "predictive index" of 60.

This index is calculated by reference to the Scholastic Aptitude Test score and grade point average. Appellant's predictive index was 59; therefore, he was not entitled to further consideration for a Key scholarship.

**3.** Specifically, black residents of Maryland were limited to attending one of the four "black colleges" in the state: Bowie State, Coppin State, Morgan State, and University of Maryland Eastern Shore.

mention was made of the Banneker Program.

In its comments to the 1985–89 Plan, OCR noted that UMCP presented "a detailed discussion of recruitment measures which include listings of recruitment tools, outreach strategies, on-campus programs, summer programs, activities to attract prospective black applicants, recruitment visitors and follow-up procedures." Appendix ("App.") at 310. OCR, however, did not directly acknowledge the Banneker Program. In 1987, UMCP submitted a revised "Black Undergraduate Recruitment Program" in which it listed the Banneker Program as an example of the expanded merit-based financial aid for minority students.

OCR is currently visiting public institutions of post secondary education to determine the progress made under the 1985–89 Plan. Maryland states that it will continue to follow the goals set forth in the 1985–89 Plan until a new one is developed. Accordingly, UMCP plans to continue offering the Banneker scholarships to black freshmen.

### Discussion

■ We review a decision granting summary judgment de novo. See e.g. Miller v. Federal Deposit Ins. Corp., 906 F.2d 972, 974 (4th Cir.1990).

■ The trial court correctly found that the Banneker Program should be examined in light of the equal protection clause of the Fourteenth Amendment and subjected to a strict scrutiny test. To survive strict scrutiny, as the trial judge noted, an affirmative action plan must serve "a compelling governmental interest" and be "narrowly tailored to the achievement of that goal." App. at 158 (citing Wygant v. Jackson Bd. of Educ., 476 U.S. 267, 274, 106 S.Ct. 1842, 1847, 90 L.Ed.2d 260 (Powell, J.) (1986)).

In Wygant, the Supreme Court held that "societal discrimination" was a concept too amorphous in nature to supply the justification for a race-conscious classification. Id. at 276, 106 S.Ct. at 1848 (plurality opinion). Because of the danger of stigmatic harm, classifications based on race, under-

standably, must be reserved for remedial settings. City of Richmond v. J.A. Croson Co., 488 U.S. 469, 493–94, 109 S.Ct. 706, 720–21, 102 L.Ed.2d 854 (1989).

At issue in Croson was a plan adopted by the City of Richmond requiring general contractors who were awarded city construction contracts to subcontract at least thirty percent of the total dollar amount of each contract to a "Minority Business Enterprise," a business at least fifty-one percent owned and controlled by individuals of certain specified racial and ethnic minorities. The Court found that the city had failed to demonstrate a compelling governmental interest which justified the plan. Id. at 505, 109 S.Ct. at 727. Finding it significant that the city was unable to point to any identified discrimination in the Richmond construction industry, the Court rejected Richmond's claim that past societal discrimination could justify racial set-asides. Id. at 505–06, 109 S.Ct. at 727. The Court emphasized that Richmond must have a "strong basis in evidence for its conclusion that remedial action ... [is] necessary." Id. at 500, 109 S.Ct. at 724 (quoting Wygant, 476 U.S. at 277, 106 S.Ct. at 1848).

Classification based upon race must be justified by specific judicial, legislative, or administrative findings of past discrimination. Id. 488 U.S. at 497, 109 S.Ct. at 722 (quoting University of California Regents v. Bakke, 438 U.S. 265, 307, 98 S.Ct. 2733, 2757, 57 L.Ed.2d 750 (1978)). It is the state that must show the existence of prior discrimination, and a strong evidentiary basis for concluding that remedial action is necessary. Id. 488 U.S. at 500, 109 S.Ct. at 724.

The district court stated that "[t]he question ... [is] whether UMCP has demonstrated with sufficient particularity that it has a history of racial discrimination which can justify the Banneker Program's existence." App. at 160. In answering this question, the court found OCR's administrative "findings" concerning the noncompliance of Maryland with Title VI demon-

strated past discrimination.[4] The court rejected appellant's view that a formal court or administrative agency finding of noncompliance was necessary in order to satisfy the evidentiary standard in *Croson*, 488 U.S. 469, 109 S.Ct. at 706, finding that *Croson's* "strong basis in evidence" was satisfied in this case.[5]

Once a court has determined that a state has proceeded upon strong evidence of discrimination in other than the immediate past, the inquiry into the legitimacy of a race-based classification turns to the state's basis for finding continuing effects of such past discrimination. In *Bakke*, a case involving explicit racial classifications in the admissions process of a graduate school, the Supreme Court stated that "[t]he State certainly has a legitimate and substantial interest in ameliorating, or eliminating where feasible, the *disabling effects* of identified discrimination." *Bakke*, 438 U.S. at 307, 98 S.Ct. at 2757 (emphasis added). By focusing the inquiry on the present-day effects, the Court limited the race-based action to redressing the present continuing manifestations of past discrimination. In *Wygant*, the Court continued to emphasize that the legitimate objective behind such affirmative action policies is to remedy "the *present effects* of past discrimination." *Wygant*, 476 U.S. at 280, 106 S.Ct. at 1850 (emphasis added) (quoting *Fullilove v. Klutznick*, 448 U.S. 448, 480, 100 S.Ct. 2758, 2775, 65 L.Ed.2d 902 (1980) (opinion of Burger, C.J.)).

In *Croson*, the Court stated that "if the city could show that it had essentially become a "passive participant" in a system of racial exclusion practiced by elements of the local construction industry, we think it clear that the city could take affirmative steps to dismantle such a system." *Croson*, 488 U.S. at 492, 109 S.Ct. at 720. Thus, *Croson* indicates that race-based action may be legitimate governmental action if it is designed to "dismantle" or remedy discriminatory aspects of a system. The Court obviously intended that for a program to withstand scrutiny, there must be some discriminatory effect which could be the subject of present remediation.

Although it recognized that the program could not withstand scrutiny unless the state could cite present effects of past discrimination, the district court wavered at this point. The court began its analysis of present effects by observing that there was "some evidence" that there were *no present effects* of past Title VI violations at UMCP. Specifically, the court noted that in 1989, UMCP exceeded its goal for recruiting black freshmen, and nearly met its goal for retention of black undergraduates. The record before this court indicates that during the academic years 1989 and 1990, more than fifteen percent of the incoming freshmen class was black.

Moreover, the court observed that the President of UMCP testified that, with regard to admission and financial aid, UMCP

---

4. In the amicus brief of the State of Ohio, *et al.,* it is argued that a state has a compelling interest in the promotion of racial diversity that would support the Banneker Program. The district court did *not* cite the need for diversity as a basis for this program, and it does not appear that UMCP established the Banneker Program with this goal in mind. Moreover, in *University of California Regents v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), the Court stated that:

The diversity that furthers a compelling state interest encompasses a far broader array of qualifications and characteristics of which racial or ethnic origin is but a single though important element. Petitioner's special admissions program [a set-aside number of places for certain minorities], focused *solely* on ethnic diversity, would hinder rather than further attainment of genuine diversity.

*Id.* at 315, 98 S.Ct. at 2761 (emphasis in original). In this case, the scholarship funds are set aside for black students only and ethnic diversity does not appear to be the real interest behind the program.

5. Stating that "[i]f ever there was an administrative record demonstrating past discrimination, this is it," app. at 161A, the court found that OCR's findings, together with continuing OCR review of UMCP's desegregation efforts, were sufficient to demonstrate a past history of discrimination. The court stated that even if no federal officer knew about or approved of the Banneker Program, it was "largely irrelevant." The court went on to find, however, that the fact that OCR reviewed and revised the recruitment plans submitted by UMCP indicated that OCR knew about the Banneker Program.

had not discriminated against blacks for many years. Although the President of UMCP referred to the "lingering effects of historic discrimination" in his deposition, app. at 453, he did not explain what he meant. As indicated in *Croson*, general societal harm is insufficient.

The district court concluded that the effects of longstanding discrimination were so pervasive that it was "premature to find that there are no present effects of past discrimination at the institution." *Id.* at 167A. Later, the district court referred to the "now-dormant specter of past discrimination." *Id.* Based upon this language, it appears that the district court, although recognizing the need to identify some present effect of past discrimination, failed to make a specific finding of such present effect. Rather, it merely found that it would be prudent to keep the race-exclusionary scholarship in place at least until OCR concluded its investigation of UMCP.[6] While this might be perceived as fair to UMCP, it does not satisfy constitutional standards. As indicated earlier, in order to justify a race-based remedy in a case where identifiable discrimination occurred a number of years in the past, a finding of such past discrimination is not sufficient. There must be some present effect of this past discrimination that the program is designed to redress.

### Conclusion

In determining whether a voluntary race-based affirmative action program withstands scrutiny, one cannot simply look at the numbers reflecting enrollment of black students and conclude that the higher educational facilities are desegregated and race-neutral or vice versa. It may very well be, given the complexities of institutions of higher education and the limited record on appeal, that information exists which provides evidence of present effects of past discrimination at UMCP, but no such evidence was brought to our attention nor is it part of the record. The Supreme Court has declared that in some situations the State *may* enact a race-exclusionary remedy in an attempt to eliminate the effects of past discrimination. The proper focus at this stage is whether present effects of past discrimination exist and whether the remedy is a narrowly tailored response to such effects.[7]

Judgment for appellees must be based on facts which show that vestiges of past discrimination existed, which made the 1988–90 form of the Banneker Program a legitimate, constitutional remedy on or about the time appellant was denied the opportunity to compete for the scholarship. Accordingly, we hereby reverse the grant of summary judgment and remand this action to the district court for a determination as to the present effects of past discrimination at UMCP. Should no further evidence be available upon remand, summary judgment for appellant would be appropriate.

REVERSED AND REMANDED.

---

6. The district court found that although "an indefinite program would violate the equal protection clause ... at least until OCR has determined that UMCP is in compliance with Title VI, the Banneker program's continuing existence does not offend the Constitution." App. at 169–70A.

7. On appeal, appellant has also contended that the Banneker Program is not narrowly tailored and that he is entitled to an order requiring UMCP to consider him for a Banneker Scholarship. The program may be valuable as a recruitment tool, but the value of the much-expanded program, as opposed to the program in its more limited form or other non-race-based remedies, is not clear. Because we are remanding the case for further determination, we do not resolve these issues at this time.